THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MICHAEL PIRA, Defendant-Appellant.

Second District    No. 2—87—0028

Opinion filed April 4, 1988.—Rehearing denied May 4, 1988.

648

Thomas P. Cernek & Associates, of Chicago (Thomas P. Cernek and Jeffrey T. Cernek, of counsel), for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (William L. Browers and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DUNN delivered the opinion of the court:

Defendant, Michael Pira, was indicted by the grand jury of Lake County with one count of unlawful possession of a controlled substance (cocaine) with intent to deliver (Ill. Rev. Stat. 1985, ch. 56½, par. 1401(a)(2)), one count of unlawful possession of a controlled substance (Ill. Rev. Stat. 1985, ch. 56½, par. 1402(a)(2)), and one count of conspiracy (Ill. Rev. Stat. 1985, ch. 38, par. 8—2(a)). After a bench trial, he was found guilty of both possession offenses, and the conspiracy charge was dismissed. Defendant was sentenced to a term of eight years' imprisonment in the Department of Corrections for possession with intent to deliver and was assessed court costs and fines in the amount of $14,000. On appeal, defendant argues, among other things, that he was not found guilty beyond a reasonable doubt, that there was no probable cause for his arrest, that evidence was erroneously admitted, and that he was denied a fair trial due to prosecutorial misconduct. We affirm.

Defendant's arrest on the night of February 21, 1986, was the result of an undercover police investigation led by Special Agent Roosevelt Davis of the Illinois State Police. Also arrested with defendant were Anthony Zito, Thomas Osvath and Kevin Dombrowski. Charges against Dombrowski were eventually nol-prossed. After the State reduced the charges against him, Osvath pleaded guilty to unlawful possession of a controlled substance and testified

against defendant and Zito.

Agent Davis testified both at trial and at a hearing on defendant's motion to quash arrest and suppress evidence. In both instances, his descriptions of the events leading to defendant's arrest were the same, so this opinion will, for the most part, rely on Davis' trial testimony. At the hearing on the motion to suppress, however, Davis also testified that he had bought a gram of cocaine from Osvath on January 29, 1986. He testified that Osvath had taken him to the Z-Gathering Lounge in Des Plaines, where they saw Zito in Zito's silver Audi. Davis gave Osvath money; Osvath met with Zito and came back with a packet of cocaine.

At trial Davis testified that on February 18, 1986, he again contacted Osvath and asked if Osvath could arrange the purchase of a kilogram of cocaine. Osvath said he would have to contact his source. Osvath later told Davis that he. could obtain one-fourth of a kilogram. Davis spoke with Osvath again on February 19, and Osvath told him he could get eight ounces of cocaine for $1,700 per ounce. Davis told Osvath he would call the next day to arrange the purchase.

On February 20, 1986, Davis and Osvath agreed to meet at 10 p.m., but they did not meet then. Osvath later contacted Davis and told him he was waiting for "Tony" at a bar. Later that night, Osvath again contacted Davis and said that the cocaine had not been delivered. Davis said he would contact Osvath the next day. On the 21st, Osvath told Davis that Tony's Audi had been in an accident the night before. Later that day, Osvath and Davis again discussed the purchase of eight ounces of cocaine, and Davis told Osvath that he would buy cocaine elsewhere if Osvath did not contact him by 8:30 that night. At 8 p.m., Osvath told Davis that he was at a bar and had tested part of the cocaine. Davis told Osvath he would meet him at the Z-Gathering Lounge at 10 p.m. Before meeting with Osvath, however, Davis met with other police officers, who were to conduct surveillance of the purchase, at the State Police headquarters in Des Plaines.

At 10 p.m., Davis called Osvath to tell him he was on his way. Osvath said that all the cocaine was not at the bar and that they would have to drive a short distance to get it. Davis expressed displeasure with the way the deal was unfolding and asked to speak to Tony. Tony said they would have to drive to Lake County because his source was "hot" in Cook County. Davis then met Osvath at the Z-Gathering Lounge. Osvath got in Davis' car, and they drove to meet Zito at the Pot/Pan restaurant. Davis followed Zito and Osvath north on Rand Road into Lake County. At 11:30, Zito stopped at a gas sta-

tion in Fox Lake, Illinois. He made a phone call and hung up without talking. The phone then rang, and Zito had a conversation. Zito told Davis that he had contacted his source and that the cocaine would be brought to the parking lot of a McDonald's restaurant down the street. Davis then called the police operator and also noticed the phone number on the telephone Zito had used.

Davis followed Zito and Osvath to the McDonald's and parked in the north portion of the lot facing south. Osvath got into Davis' car and Zito came to the driver's side. Zito told Osvath to make sure the money was all there. Zito moved his car, which had been next to Davis' car, to the west end of the lot facing west. West of the lot was a frozen lake. Davis asked Osvath how long it would be before the cocaine would arrive, and Osvath said it would be brought on snowmobiles. Zito flashed his headlights towards the lake, and Davis saw two lights approaching the lot from the west. Davis saw both lights flash. The snowmobile riders, both dressed in black and wearing black helmets, parked on the lake and met Zito on the ice west of the lot. Zito came back and asked for the money for the cocaine. Davis said he would not give over the money until he had the cocaine. Zito walked back towards the ice, and Davis moved his car next to Zito's. Zito met the riders again, and Davis told Osvath, who had been helping him count the money, to go make sure the cocaine was there. When Davis saw Osvath, Zito and defendant look into a brown bag held by defendant, he gave the arrest signal. Davis jumped down to the ice and arrested defendant. He saw the brown bag on the ice near defendant, recovered it after securing defendant, and found that it contained a clear plastic bag of white powder. Davis searched defendant and found a telephone pager which displayed the same number as the phone that Zito used at the gas station. The four arrestees were taken to the Fox Lake police department for processing. Davis also testified regarding the processing of the bag of powder.

On cross-examination, Davis testified that, although both snowmobile riders were dressed in black with helmets, they were not standing together when he saw the one closer to him holding the bag. Davis did not lose sight of the closer one, and Davis himself arrested that rider.

Several other officers involved in the arrests also testified. None of them saw defendant or anyone other than Davis with the bag, but none of them were as close to defendant as Davis was. Their testimony as to the sequence of events from the Z-Gathering Lounge to the McDonald's, however, essentially corroborates Davis' testimony.

Those in position to see also testified to seeing the snowmobiles arrive, although none testified that the approaching lights flashed. Officer Collins did testify somewhat differently than Davis regarding the chain of evidence, but that difference will be addressed below.

Osvath also testified for the prosecution. He corroborated Davis' version of the phone calls and other events leading up to the McDonald's parking lot. From that point, there are some differences from Davis' account of the arrest. Osvath testified that when Davis asked him to go check the cocaine, Zito did not look in the bag. Osvath testified that when he approached defendant on the ice, defendant warned him that someone in the parking lot had a gun and that Osvath should keep his hands out of his pockets. Osvath stated that the bag was at defendant's feet and that defendant reached into the bag, pulled out a small white rock and said, "Here, give this to your man." Osvath believed the rock was cocaine. Osvath started to return to Davis' car, but as he came up to the parking lot, a police officer put a gun to Osvath's head and Osvath dropped the rock. Osvath further testified that the bag was not found until several minutes after he was arrested by someone other than Davis. Osvath admitted that he agreed to testify when the State reduced the charges against him. He also admitted to several prior convictions, mostly for traffic violations, but some for more serious offenses.

The trial court found that the State had proved the factual basis for both possession charges, but only sentenced defendant on the more serious charge.

■ Defendant first argues that he was not proved guilty beyond a reasonable doubt of possession of a controlled substance with intent to deliver (Ill. Rev. Stat. 1985, ch. 56½, par. 1401(a)(2)). He contends that Davis' testimony was impeached and that the State did not prove that defendant ever possessed the cocaine. He also argues that Osvath's testimony should be discounted because it was the result of a plea bargain and because of Osvath's prior convictions.

The trial court's finding of guilt, however, depended for the most part on its assessment, as the trier of fact, of the credibility of Davis and Osvath. A reviewing court will not ordinarily substitute its judgment for that of the trier of fact, whose function is to weigh the evidence, resolve any apparent conflicts or inconsistencies therein, and assess witness credibility. (*People v. Nally* (1985), 134 Ill. App. 3d 865, 868.) As such, a judgment will only be reversed if it is so improbable or palpably contrary to the evidence as to raise a reasonable doubt of guilt. (*Nally*, 134 Ill. App. 3d at 868.) No such doubt arises from the record here.

At trial, Davis testified that he saw only Zito, Osvath and defendant looking into the bag just before the arrest signal and that he found the bag of cocaine on the ice after immobilizing defendant. This testimony was impeached in that it was stipulated that Davis had testified before the grand jury that all four defendants had looked in the bag. Also, Davis' report of the arrest indicated that he had found the bag on the ground at McDonald's parking lot, rather than on the ice. Not only are these inconsistencies relatively minor, but, moreover, Davis' trial testimony was corroborated by other witnesses. Both Osvath and Officer Livas testified that Dombroski was farther out on the ice than defendant, supporting Davis' testimony at trial that Dombroski did not look in the bag. Also, Officer Roskusga testified that he saw Davis coming off the ice with bag in his hand. Clearly, Davis' testimony was not so impeached as to require the trial court to disregard the entire testimony.

■ Furthermore, despite defendant's arguments to the contrary, the State proved that defendant actually possessed the cocaine. It is true that mere proximity to a controlled substance is not enough to prove possession. (*People v. Curry* (1976), 37 Ill. App. 3d 72, 74.) But whether possession has been proved is a question of fact to be determined by the trier of fact, whose findings, again, will not be disturbed on review unless the evidence is so palpably contrary to the verdict as to create a reasonable doubt of guilt. *People v. Knight* (1985), 133 Ill. App. 3d 248, 258.

Defendant argues that, because he and Dombroski were dressed alike and neither took off his helmet until after the arrest and because Davis had never seen defendant before the arrest, Davis could not have been sure if it was actually defendant who was holding the bag. As mentioned above, however, several witnesses testified that Dombroski stayed farther out on the ice than defendant, and Davis testified that he did not lose sight of the person holding the bag. Moreover, Osvath saw defendant's face while they were on the ice and was able to recognize defendant as the one who had the bag by defendant's black eye and stitches. The fact that Davis had not seen defendant before is irrelevant as long as Davis was able to keep track of which snowmobile rider held the bag. The court's conclusion that defendant possessed the cocaine does not appear unreasonable.

■ Although defendant further contends that Osvath's testimony should have been discounted, Davis' testimony alone was a sufficient basis to uphold the finding of guilt. The trial court could also have reasonably believed Osvath. The court was aware that Osvath had agreed to testify in exchange for a reduction in charges and that Os-

vath had several prior convictions. Even so, the court specifically found Osvath to be a credible witness, which was its determination to make as the trier of fact. (*People v. Locascio* (1985), 106 Ill. 2d 529, 537.) We conclude that the trial court's judgment was not so palpably erroneous as to raise a reasonable doubt of defendant's guilt.

■ Defendant next argues that the evidence seized should have been suppressed and his arrest quashed because Davis did not have probable cause to arrest him. It is axiomatic that a warrantless arrest is invalid unless there is probable cause to believe the suspect is committing or has committed an offense. (*People v. Holloway* (1985), 131 Ill. App. 3d 290, 304.) "Probable cause exists in the objective sense if the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense." (*People v. Simpson* (1984), 129 Ill. App. 3d 822, 830, citing *People v. Moody* (1983), 94 Ill. 2d 1, 7.) Under this standard, we believe that Davis had probable cause to arrest defendant when the arrest signal was given.

The purpose of Davis' meeting with Osvath and Zito was for a cocaine transaction to take place. Davis had bought cocaine from Osvath once before. Zito told Davis that they would have to go to Lake County to get the cocaine and that Davis would have to follow him. Zito stopped to make a phone call, and Osvath then told Davis that the cocaine would be brought to McDonald's on snowmobiles. When Davis, Zito and Osvath arrived at McDonald's, Zito flashed his headlights towards the frozen lake west of the parking lot, and the snowmobiles appeared. Zito talked to the snowmobile riders and then told Davis that he needed Davis' money to get the cocaine. Osvath helped Davis count the money. Davis refused to part with the money without first seeing the cocaine, so he sent Osvath to look at the cocaine. When Osvath looked in to the bag held by defendant, Davis gave the arrest signal.

Although defendant argues that no evidence was adduced which gave rise to probable cause for his arrest, the above-stated facts clearly are sufficient to cause a reasonable person to believe that the person holding the bag was delivering the cocaine Davis had arranged to buy. Zito as much as told Davis this by telling Davis, after speaking to the defendant, that he would have to give over the money to get the cocaine. While defendant contends that Davis' testimony was given little credence by the trial court, as evidenced by statements the court made as to Osvath's credibility, there is no indi-

cation that the trial court disbelieved Davis. "It is the function of the trial court to analyze the facts and circumstances known to the arresting officers at the time of the arrest in order to determine their sufficiency; a reviewing court will not disturb these findings unless they are manifestly erroneous." (*Simpson*, 129 Ill. App. 3d at 830.) The trial court's finding here does not appear manifestly erroneous.

■ Defendant next argues that the trial court erroneously refused to rule on his motion for a directed finding of not guilty at the close of the State's case in chief. A review of the record, however, reveals that this argument is entirely without merit. The trial court specifically denied defendant's motion.

Moreover, this court need not even address this argument because it has been waived. Defendant did not raise the issue at trial or in his post-trial motion. It is axiomatic that failure to raise an issue at trial or in a post-trial motion constitutes waiver. *People v. Shum* (1987), 117 Ill. 2d 317, 340; *People v. Stewart* (1984), 104 Ill. 2d 463, 488.

It is also readily apparent why defendant's trial counsel did not raise the issue below. The trial court went so far as to clarify for defense counsel the standard used in ruling on such motions before listening to arguments on the motion. Following arguments, the court explicitly denied the motion. The trial court's statement quoted in defendant's brief is taken completely out of context and was followed by the trial court's explanation that he simply preferred to call the motion one for acquittal rather than a motion for a directed verdict. This argument is thus not only waived, but completely unfounded.

■ Defendant next argues that the trial court erred in admitting into evidence People's exhibit No. 1, the cocaine, due to infirmities in the chain of possession and the State's failure to furnish defendant with the evidence inventory sheet prior to trial. After examining the testimony regarding the evidence and the authority cited by defendant, however, we find that the trial court's ruling was correct.

This court had opportunity to discuss the law regarding chain of possession in *People v. Irpino* (1984), 122 Ill. App. 3d 767. "[B]efore real evidence may be admitted at trial, an adequate foundation must be laid which establishes that the item sought to be introduced is the actual item involved in the alleged offense and that its condition is substantially unchanged." (*Irpino*, 122 Ill. App. 3d at 772-73.) Where, as here, the item is not readily identifiable or is susceptible to alteration by tampering or contamination, its chain of custody must be established with sufficient completeness to render it improbable that the original item has either been exchanged, contaminated,

or subjected to tampering. (*Irpino*, 122 Ill. App. 3d at 773.) Whether to admit physical evidence at trial lies within the sound discretion of the trial court whose decision will not be reversed on appeal absent an abuse of that discretion. *Irpino*, 122 Ill. App. 3d at 773.

Agent Davis testified in this case that after he seized the bag of white powder, he took it to Area 5 Headquarters, where he heat-sealed it in a plastic bag and deposited it in an evidence safe in the early morning hours of February 22, 1986. Officer Collins was also present when Davis heat-sealed the bag and put it in the safe. Davis testified that he retrieved the sealed bag from the safe on Tuesday, February 25, 1986, and took it to the laboratory to be analyzed. Davis turned the sealed bag over to Kenneth Rizer, who gave Davis a receipt. Collins also testified that Davis sealed the bag and put it into the evidence safe, but Collins testified that he next saw the bag on the morning of Monday, February 24, 1986.

Paul Titus, the chemist who analyzed the powder, testified that evidence received for analysis is put into a safe when received. He testified that when he removed the bag for testing on March 5, 1986, the bag was still sealed. He performed tests on the powder and found that it contained cocaine.

Defendant's only argument regarding the chain of custody focuses on the discrepancy between Collins' and Davis' testimony as to when the bag was taken out of the safe at Area 5 Headquarters. Although Collins said it was on Monday, Davis testified that Collins was mistaken and that it was actually taken out on Tuesday. This discrepancy merely presented the trial court with a question of fact for its resolution. It is within the trial court's function as the trier of fact to determine the credibility of witnesses and the weight to be given their testimony; discrepancies in the testimony only affect the weight to be afforded the testimony, not the admissibility of the evidence. *Irpino*, 122 Ill. App. 3d at 775.

■ Although defendant also argues that he was not provided with a copy of the evidence inventory sheet prior to trial, that fact does not render the evidence inadmissible. To begin with, defendant cites no authority for this argument, so this court need not consider it. (107 Ill. 2d R. 341(e)(7).) Moreover, failure to provide the sheet was a discovery violation at worst for which the sanctions were within the trial court's discretion. Based on the testimony produced and the availability of all persons listed on the sheet, the trial court found no prejudice to defendant and therefore properly did not exclude the evidence as a sanction.

The State's burden here only required it to demonstrate a rea-

sonable probability that the exhibit had not been changed in any important respect. (*Irpino*, 122 Ill. App. 3d at 775.) The court made a factual determination that a sufficient chain existed. Since this determination was not contrary to the manifest weight of the evidence, the admission of People's exhibit No. 1 was proper.

■■ ■ Defendant next argues that he was denied his sixth amendment and due process rights to the testimony of Officer Brotan. In this vein, he also argues that he was denied a fair trial as the result of prosecutorial misconduct. Before trial, defense counsel informed the State that defendant would call the surveillance officers as witnesses. Although one assistant State's Attorney indicated he would secure the presence of those officers at trial, it appears that he did not communicate this promise to the trial attorneys, and disagreement later arose over whose responsibility it was to obtain the witnesses. Eventually, all of the witnesses sought by defendant testified, with the exception of one, Officer Brotan. The State represented that Brotan was at that time a member of the FBI in Texas.

Defendant first complains that he was denied a fair trial when the prosecutor repeatedly engaged the trial court in debate over the State's responsibility to produce Brotan. Defendant argues that the effect of the "adversarial" exchanges was to prevent the trial court from fairly and dispassionately evaluating the evidence. Not surprisingly, defendant cites no authority for this odd argument, so once again this court need not consider it. (107 Ill. 2d R. 341(e)(7).) Moreover, defendant does not indicate how he was prejudiced by the colloquy between the trial court and the prosecution, where the court chided the prosecution for its failure to secure Brotan's presence. If anything, it would seem that such an exchange would be to the prosecution's disadvantage, not defendant's.

Nor does it appear that defendant was deprived of a fair trial by Brotan's unavailability. This court has held that unless a nonappearing witness has some critical, unique knowledge or has been deliberately made unavailable, the absence of such a witness has little legal significance. (*People v. Jablonskis* (1978), 64 Ill. App. 3d 559, 562.) In this case, there is no indication that Brotan had any special knowledge or that he had been deliberately made unavailable. Defendant was able to examine all of the other officers involved in the arrest, including Brotan's partner, Officer Livas. Livas testified that he and Brotan were positioned some distance from the arrest site and did not arrive there until after defendant was lying on the ice. Brotan would thus seem to have even less critical knowledge than the unavailable witness in *Jablonskis*. There, one of three secu-

rity guards present during the defendant's arrest for shoplifting had moved out of State, but this court determined that there was no indication that the witness possessed any unique knowledge critical to the defense. (*Jablonskis*, 64 Ill. App. 3d at 563.) If a witness who was involved in all stages of a defendant's arrest does not possess unique knowledge critical to a defense, it is difficult to see how Brotan's knowledge could be any more critical. Since there is no indication that the State deliberately made Brotan unavailable, his absence did not deprive defendant of a fair trial.

Defendant argues, however, that it is the State's duty to locate and produce missing witnesses for examination by the defense, citing *People v. Payne* (1975), 30 Ill. App. 3d 624, and *People v. Brown* (1977), 47 Ill. App. 3d 616. In both of those cases, prior recorded testimony was introduced because the witnesses were unavailable at trial, and in those circumstances, it was held that the State was required to show reasonable diligence and good-faith effort to locate and secure the presence of the witnesses in court. (*Payne*, 30 Ill. App. 3d at 628; *Brown*, 47 Ill. App. 3d at 620.) Since no prior testimony from Brotan was introduced here, *Payne* and *Brown* are not controlling. The remaining cases cited by defendant involved restrictions on a defendant's right to cross-examine witnesses against him. Since defendant was not seeking to cross-examine Brotan, those cases are likewise inapplicable.

It is probably true that the prosecution should not have volunteered to secure Brotan's appearance at trial, but the failure to produce Brotan does not seem prejudicial. The trial court specifically found no bad faith on the part of the State sufficient to warrant the sanction of dismissal of the charges, especially since there was no indication of prejudice to the defendant. Therefore, although the State may not have fulfilled the promise of one assistant State's Attorney, defendant was not thereby deprived of a fair trial.

■■ Finally, defendant argues that he was improperly convicted of both unlawful possession of a controlled substance with intent to deliver and the lesser included offense of unlawful possession of a controlled substance. The State concedes that a conviction on the lesser included offense cannot stand (*People v. King* (1977), 66 Ill. 2d 551, 566, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273) but contends that the trial court dismissed the lesser count. Although it is not entirely clear from the record, we believe that the State is correct.

In pronouncing judgment, the trial court found that defendant had been proved guilty of unlawful possession of a controlled sub-

stance with intent to deliver and added that "[a]lmost naturally" he found the State had proved defendant guilty of the lesser included offense. The court recognized, however, that only one conviction was proper, and such recognition is reflected in the sentence for the greater offense only. We thus find no error.

The judgment of the circuit court of Lake County is affirmed.

Affirmed.

LINDBERG, P.J., and HOPF, J., concur.